```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12.30.14
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

KINGSLEY OTENG-AMOAKO,          :

           Plaintiff,             :

    -against-                            :

HSBC BANK USA,                           :

           Defendant.           :

------------------------------------------------------x

REPORT AND
RECOMMENDATION
TO THE HONORABLE
PAUL A. CROTTY

13cv5760-PAC-FM

**FRANK MAAS,** United States Magistrate Judge.

       Pro se plaintiff Kingsley Oteng-Amoako ("Amoako"), brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), against HSBC Bank USA ("HSBC"), his former employer. Amoako alleges that HSBC discriminated against him on the basis of his race and color when it terminated his employment and, thereafter, retaliated against him.[1]

       HSBC has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, that motion, (ECF No. 85), should be granted.

---

[1] Your Honor previously adopted my recommendation to dismiss Amoako's Title VII claims against his immediate HSBC supervisors. (See ECF Nos. 29, 46).

I.      Relevant Facts[2]

Except where otherwise indicated, the following facts are undisputed. Amoako is a Black male, who is a citizen of Australia, Ghana, and New Zealand. (Amoako Tr. 16; Compl. ¶ 18).  In March, 2011, Sebastian Zugman ("Zugman"), Gordon Liu ("Liu"), Harry Guo ("Guo"), and other HSBC employees interviewed Amoako for a position with HSBC.  (Zugman Decl. ¶ 3; Amoako Tr. 37-38).  Thereafter, on or about March 31, 2011, HSBC hired Amoako as a risk analyst in the Regulatory and Risk Analytics Group ("Group") within the company's Market Risk Group.[3]  (Amoako Tr. 34-35; Zugman Decl. ¶ 4).  He was the only Black employee in the Group and one of only two Black employees in the larger Market Risk organization.  (Pl. First Opp. Mem. at 1-2; Amoako Tr. 110, 141; see also Compl. ¶ 14).  Although Zugman approved Amoako's hiring, Amoako reported directly to Liu.  (Zugman Decl. ¶¶ 3-4; Amoako Tr. 54-55).

At or about the time of his hiring, Amoako executed a new hire form in which he agreed to comply with various HSBC employment policies.  (Amoako Tr. 39-

---

[2]      The factual recitation in this Report and Recommendation is derived principally from the declarations and exhibits annexed to HSBC's motion papers and Amoako's opposition papers.  (See Affirmation of Peter A. Milianti (ECF No. 89) ("Milianti Aff."); Declaration of Sebastian Zugman (ECF No. 90) ("Zugman Decl."); Declaration of Debra Harmon (ECF No. 91) ("Harmon Decl."); Plaintiff's Letter dated September 29, 2014, in Opposition (ECF No. 94) ("Pl. First Opp. Mem."); Plaintiff's Letter dated October 10, 2014, in Opposition (ECF No. 97) ("Pl. Second Opp. Mem."); Transcript of Amoako's deposition, taken on July 23, 2014 (ECF No. 89-1) ("Amoako Tr."); see also Amoako's Verified Complaint dated August 8, 2013 (ECF No. 1) ("Compl.").

[3]      Amoako refers to the subsidiary Group as the "Market Risk Methodologies Group."  (Amoako Tr. 35).

2

43; Milianti Decl. Ex. D).  Included among these policies were HSBC's Positive Work Environment Policy, requiring employees to "[m]aintain respectful and professional standards of behavior at all times," and HSBC's Safety/Security Policy, pursuant to which employees who "engage[d] in violent events [and] behavior; disruptive talk or action; . . . threats or acts of violence; . . . [and] behavior inducing fear" were "subject to disciplinary action up to and including termination."  (Amoako Tr. 43-46, 47-50; Milianti Decl. Exs. E, F).  Amoako understood that his failure to comply with these policies could result in "corrective action up to and including termination[.]"  (Amoako Tr. 43).

In the first year of his employment, Amoako received favorable performance ratings.  (Id. at 56-58).  On February 13, 2012, however, HSBC employee James Murphy ("Murphy") submitted a written complaint to Zugman and HSBC's Senior Vice President for Human Resources Maureen A. Gillian-Myer ("Gillian-Myer"), concerning an alleged incident earlier that day involving Amoako.  (Zugman Decl. Ex. 1).  Murphy reported that as he and three other employees were engaged in conversation in a corner of a trading floor, Amoako admonished them for gathering in a narrow space instead of in an empty office nearby.  Moments later, despite having sufficient space to pass, Amoako allegedly intentionally struck Murphy's shoulder with his own as he walked past Murphy and the others.  Amoako then "squar[ed]" up to Murphy when Murphy protested that Amoako's behavior was aggressive and rude. (Harmon Decl. ¶¶ 7-8 & Ex. 1).  Amoako had passed by the group at least twice prior to this incident, and he

3

never previously had spoken with Murphy or two of the other three employees involved. (Harmon Decl. ¶ 32; Amoako Tr. 58-61, 65-67, 81).

Debra Harmon ("Harmon"), an African-American human resources employee who has conducted more than one hundred investigations for HSBC, investigated Murphy's complaint. (Harmon Decl. ¶¶ 1-2; Amoako Tr. 128). Harmon interviewed Murphy, the three employees who had been conversing with him, Amoako, and Liu. (Harmon Decl. ¶¶ 5-30). At Amoako's suggestion, Harmon also interviewed Peter Suh and Hau (Andy) Chang ("Chang"), both of whom had desks near where Murphy said the incident occurred. (Id. ¶¶ 23-26). Although Chang was not present at the time of the incident, each of the other interviewees gave accounts of the incident that were generally consistent with each other and corroborated Murphy's complaint. (See id. ¶¶ 11-12, 23-24, 26, 27-30). Suh, in particular, recalled that Amoako was "yelling" while two other persons standing near Murphy tried to "calm [him] down." (Id. ¶ 23). Suh also recalled Amoako saying "something to the effect of: 'don't fucking touch me,' or 'get the fuck out of my way.'" (Id.).

For his part, Amoako evidently admitted to Harmon that he had raised his voice and stepped toward Murphy after passing by him and the others, but denied intentionally hitting Murphy's shoulder. (Id. ¶¶ 16-17; see Amoako Tr. 73 ("I don't think I ever really raised my voice deliberately . . . . It could have been such that, you know . . . ."), 82 ("I may have projected my voice in his direction"). He also suggested that Harmon check for audio and video recordings of the incident. (Harmon Decl. ¶ 19).

4

David Friedman ("Friedman"), HSBC's Vice President and Physical Security Risk Manager, visited the location, and reported to Harmon that it was constricted, but that a passer-by could have avoided any physical contact with four individuals congregated there.  (Id. ¶¶ 13, 31).  He also reported that no video camera or microphones had captured the incident.  (Id. ¶ 31).

Based on her investigation, Harmon concluded that Murphy's complaint was substantiated, that Amoako had "acted in an inappropriate and aggressive manner," and that he had "intentionally bumped . . . Murphy."  (Id. ¶¶ 32-33).  Harmon reported her findings in writing to Liu and Gillian-Myer.  (Id. ¶ 34).  Subsequently, based on Harmon's findings, Zugman determined that Amoako had violated HSBC's anti-violence policies and should be terminated. (Zugman Decl. ¶¶ 7-9).  Harmon then delivered the news to Amoako on or about February 14, 2012.  (Compl. ¶ 11).

Following his termination, Amoako filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in or around April 2013.  (Id. Ex. 1).  The EEOC dismissed that charge in May 2013, copying HSBC on its "right to sue" letter.  (Id. Ex. 2).  Previously, in or around May 2012, Amoako had  secured employment with Bank of America. (Amoako Tr. 114; Compl. ¶ 15).  That offer subsequently was withdrawn in or around July 2012.  (Amoako Tr. 114-16).  Amoako contends that a Bank of America representative indicated that the decision not to hire him was based solely on negative feedback from HSBC.  (Id. at 126; Compl. ¶¶ 15-16).

II.     Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record. Fed. R. Civ. P. 56. "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). To defeat a motion for summary judgment, the nonmoving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256.

"[T]rial courts must be especially chary" when considering summary judgment motions in discrimination cases, because "the employer's intent is ordinarily at issue" in such cases. Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir.

1996).  Nevertheless, "[e]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (internal quotations and citations omitted).

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court.  Fischl, 128 F.3d at 55; see also Fed. R. Civ. P. 56(e) 1963 Advisory Committee's note.  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Fischl, 128 F.3d at 55.

Although the same summary judgment rules apply to a party proceeding pro se, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded.  See McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (pleadings should be read liberally and interpreted to "raise the strongest arguments that they suggest") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).  By the same token, however, a pro se party's "bald assertion[], completely unsupported by evidence," is not sufficient to overcome a motion for summary judgment.  Pointdujour v. Mount Sinai Hosp., 121 F. App'x 895, 898 (2d Cir. 2005) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)).  Consequently, "when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may

grant summary judgment to the employer." Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) (internal quotation marks omitted).[4]

III.   Title VII

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To overcome a motion for summary judgment under Title VII, a plaintiff must withstand the three-part burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). First, the plaintiff must satisfy an initial burden of "proving by the preponderance of the evidence a prima facie case of discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). Accordingly, the

---

[4] HSBC complains that Amoako never submitted any counterstatement responding to HSBC's Rule 56.1 Statement of Undisputed Facts, despite having been served with the required notice advising him of the requirements of the Federal Rules of Civil Procedure. (See Def.'s Reply Mem. (ECF No. 98) at 2 & n.2). If Amoako were represented by counsel, this failure would ordinarily result in HSBC's facts being deemed admitted. Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003). As the Second Circuit has emphasized, however, pro se litigants are entitled to "special solicitude . . . when confronted with motions for summary judgment." Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (citing Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988)). For that reason, notwithstanding a pro se plaintiff's failure to comply strictly with the Local Rules, a court "retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." Wali v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (court has "broad discretion to determine whether to overlook a party's failure to comply with the local rules"). I therefore have adopted Amoako's factual assertions to the extent that they are supported by admissible evidence.

plaintiff must demonstrate that: (1) he fell within a protected class under Title VII; (2) he was qualified for the position he held; (3) he was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).

Once the plaintiff makes out a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quoting Stratton, 132 F.3d at 879)).  The limited purpose of this step is to "force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent."  See Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997), abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000).

Finally, if the defendant provides a non-discriminatory rationale for the employment decision, the rebuttable presumption dissipates and the burden shifts back to the plaintiff to prove that the proffered non-discriminatory reason was actually a pretext for discriminatory conduct.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93-94 (2d Cir. 2001).  In short, the plaintiff must prove that "discrimination was the real reason for the [adverse] employment action."  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Ultimately, "the bottom line in a Title VII summary judgment motion is, simply, whether plaintiff has presented sufficient evidence from which a reasonable trier of fact could determine that defendants discriminated against [him]." Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *5 (S.D.N.Y. May 29, 2007); see also Reeves, 530 U.S. at 143 ("Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal quotation marks omitted).

IV. Application of Law to Facts

In his papers, Amoako maintains that the incident leading to his firing did not occur (Pl. Second Opp. Mem. at 1); that "no evidence or facts presented" support that it occurred (id. at 2); and that Murphy and the persons with whom he had been talking gave fictional accounts of the incident because they had a "shared professional interest." (Id. at 1). In short, Amoako's argument appears to be that he was a well-qualified employee with good performance reviews, that the incident was "grossly exaggerat[ed]," and that the only characteristic that distinguished him from his coworkers was his race. From this, he concludes that the decision to terminate him was discriminatory. (Id. at 4, 8).

A. Prima Facie Case

It is undisputed that Amoako is a member of a protected class, who was qualified for his position, and who suffered an adverse employment action when he was

terminated. Nevertheless, Amoako has failed to raise a genuine issue of material fact with respect to the issue of whether HSBC's decision to discharge him was motivated by discrimination. As an essential element of his prima facie case, Amoako must demonstrate that his dismissal occurred under circumstances giving rise to an inference of discrimination. See Reynolds, 685 F.3d at 202. Here, however, other than pointing to the racial composition of his Group, and the larger organization of which it was a part, Amoako has not cited any basis for his belief that his termination was based on improper discriminatory animus.

At the outset, the mere fact that Amoako was the only Black employee in the Group, and perhaps its only African employee, does not, without more, give rise to an inference that his termination was motivated by discrimination. See Risco, 868 F. Supp. 2d at 105 ("Without considerably more analysis and interpretation of why and how it came to be that Plaintiff was the only [dark-skinned, Hispanic employee in her department], that fact in isolation is of limited value to the Court. No rational finder of fact could use this piece of information alone to infer that Plaintiff's termination was based on impermissible racial animus.") (internal quotation marks omitted; alteration in original); Mattison v. Potter, 515 F. Supp. 2d 356, 374 (W.D.N.Y. 2007) (assumption that harassment of plaintiff was racially motivated because she was the only black, female employee in her unit is "too speculative to warrant trial").

Amoako could, of course, establish an inference of discrimination by showing that HSBC treated him "less favorably than similarly situated persons outside of

11

[his] protected class." Maturine v. Am. Int'l Grp., Inc., No. 04 Civ. 9064 (GBD), 2006 WL 3206098, at *5 (S.D.N.Y. Nov. 6, 2006) (citing Graham, 230 F.3d at 40). A plaintiff seeking to make such a prima facie showing must establish, however, that the other employees had a "situation sufficiently similar to . . . support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001). Here, Amoako concedes that he is unaware of any HSBC employee who acted in "an aggressive and inappropriate manner toward other employees [but] who was not terminated." (Amoako Tr. 105). Consequently, there can be no inference of discrimination simply because he was fired. See Risco, 868 F. Supp. 2d at 100 (to establish an inference of discrimination based on disparate treatment of similarly-situated employees "a plaintiff must . . . show that those employees engaged in acts of comparable seriousness but were not punished as severely as plaintiff") (quoting Graham, 230 F.3d at 40).[5]

Moreover, although the "same actor" inference is not dispositive, where "the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir.

---

[5] Amoako evidently contends that HSBC must demonstrate, as a defense, that there were no similarly-situated individuals treated differently than he was treated. (See Pl. Second Opp. Mem. at 3, 5). Contrary to this assertion, in a Title VII case, it is the plaintiff who must establish a prima facie case of discrimination by establishing the existence of similarly-situated, but more favorably treated, comparators who are not members of the plaintiff's suspect class. See Risco, 868 F. Supp. 2d at 100.

1997); accord Schnabel v. Abramson, 232 F.3d 83, 91 (2000). This is "a highly relevant factor in adjudicating a motion for summary judgment," Schnabel, 232 F.3d at 91, which the Second Circuit has noted is "especially so when the firing has occurred only a short time after the hiring." Grady, 130 F.3d at 560. Here, it is undisputed that Zugman decided both to hire Amoako and to fire him. (Zugman Decl ¶¶ 3, 9). Accordingly, even if he was the only Black African employee in the Group, the fact that he was terminated by Zugman does not suggest a discriminatory motive. Amoako notes that he did not report directly to Zugman, but that does not alter this conclusion.

In sum, Amoako has failed to present any evidence that raises a genuine issue of material fact as to whether his dismissal was motivated by discrimination. Consequently, because he has not established a prima facie case of discrimination, HSBC is entitled to summary judgment.

    B.    Nondiscriminatory Rationale

In its papers, HSBC has articulated a legitimate, nondiscriminatory reason for terminating Amoako's employment. Specifically, HSBC contends that its investigation gave rise to a good faith belief that Amoako had acted aggressively and inappropriately by bumping Murphy's shoulder with his own, in violation of HSBC's employment policies. (Def.'s Mem. (ECF No. 88) at 11-13; Harmon Decl. ¶ 32; Zugman Decl. ¶ 8). This unquestionably is a valid nondiscriminatory basis for his dismissal. See Toro v. Arnold Foods Co., 620 F. Supp. 2d 288, 294 (D. Conn. 2009) (employer's explanation that it dismissed plaintiff for violations of company "rules and regulations

13

prohibiting violence in the workplace" constituted a legitimate nondiscriminatory rationale at the second McDonnell Douglas stage).

C. Pretext

Accordingly, "in order to defeat summary judgment, [Amoako] must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by . . . discrimination." Grady, 130 F.3d at 560. Stated somewhat differently, Amoako must proffer some admissible evidence indicating that HSBC's stated rational was pretextual. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37-38 (2d Cir. 1994).[6] In this regard, Amoako contends simply that the allegations against him were false. (See Pl. Opp. Mem at 1-2; Pl. Second Opp. Mem. at 8-9).

The mere existence of a factual dispute concerning the correctness of HSBC's factual findings is not sufficient to defeat summary judgment in this case. See, e.g., Fleming v. MaxMara USA, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009), aff'd, 371

---

[6] Amoako appears to have confused the sequence and placement of the shifting-evidentiary burdens at the second and third stages of the McDonnell Douglas analysis. Specifically, he contends that a plaintiff may first establish that an employer's actions are a pretext, and thereby shift the burden of persuasion to the employer to prove a nondiscriminatory motivation for an adverse employment action. (Pl. Second Opp. Mem. at 14). This is incorrect. At the second stage of the analysis, the employer merely bears a burden of production to assert a nondiscriminatory reason for their action. See Risco, 868 F. Supp. 2d at 99. Once offered, the plaintiff must then "'either . . . prov[e] that a discriminatory motive, more likely than not, motivated the defendants or . . . prov[e] both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'" Id. (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). In short, under Title VII, the employer never bears the burden to prove that its action was not discriminatory.

Fed. Appx. 115, 117-18 (2d Cir. 2010) ("[A] plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact."); Risco, 868 F. Supp. 2d at 104 (Plaintiff's "claim that she was 'falsely accused of workplace violence' and 'subjected to false write-ups' . . . does not give rise to an inference that [her supervisor's] conduct was motivated by bias."). Rather, to prevail on its motion, all that HSBC need show is that it had a good faith belief that Amoako had violated its workplace policies. See id. at 105-06 ("Plaintiff's argument that she did not engage in some of the conduct Defendant relied on as a legitimate reason for her termination is irrelevant so long as Defendant had a good faith belief that plaintiff had engaged in such conduct.") (citing Hargett v. N.Y. City Transit Auth., 640 F. Supp. 2d 450, 475-76 (S.D.N.Y. 2009), aff'd sub nom. Hargett v. Metro. Transp. Auth., 381 Fed. Appx. 12 (2d Cir. 2010)); Jourdain v. Serv. Employees Int'l Union Local 1199, No. 09 Civ. 1942 (AKH), 2010 WL 3069965, at *8 (S.D.N.Y. July 28, 2010) ("[Employer] had a good faith belief that [plaintiff] committed wrongdoing, and therefore, had a legitimate reason to terminate [plaintiff's] employment.").

       Here, the undisputed evidence shows that HSBC conducted a thorough investigation of the incident. Indeed, in addition to Murphy and the others with whom he had been talking, Harmon interviewed Amoako and two witnesses whom he had identified. One of the witnesses suggested by Amoako actually confirmed that Amoako had "used profanity," behaved "aggressively," and acted in an "inappropriate manner."

15

(See Harmon Decl. ¶¶ 21-26). Harmon also investigated Amoako's contention that the incident might have been recorded but concluded it was not. (Id. ¶ 31). Ultimately, Harmon concluded that Amoako had acted intentionally – in part because he had passed the group twice without incident before the altercation took place. (Id. ¶ 32). Based on Harmon's investigation, HSBC clearly had a good faith basis to find that Amoako had acted in an aggressive and inappropriate manner, in violation of HSBC's policies, and therefore should be terminated. Accordingly, even if HSBC's findings ultimately could be shown to be incorrect, there is no reason to believe that HSBC had a discriminatory motive for terminating his employment when it did. See Maturine, 2006 WL 3206098, at *6 ("An employer's decision to fire an employee may be unwise, unreasonable, or wrong, but that is not a valid basis from which to conclude that the proffered reason is pretextual.") (citing DeMarco v. Holy Cross High Sch., 4 F.3d 166, 170-71 (2d Cir. 1993)).

      D.     Retaliation

Although HSBC's motion is silent as to the issue of retaliation, Amoako's complaint clearly alleges that following his dismissal, HSBC "continue[d] to commit acts of discrimination" by providing "Bank of America Merrill Lynch with negative information that le[]d to an offer of employment being revoked." (Compl. ¶ 18). Amoako purportedly makes this claim based on his discussions with a Bank of America representative named Jeffrey Alexander. (Amoako Tr. 115). It thus appears that Amoako is alleging that he was the victim of retaliatory conduct by HSBC.

16

Under Title VII, it is unlawful for an employer to retaliate against an employee who has exercised his statutory right to complain about conduct that he considers discriminatory. 42 U.S.C. § 2000e-3(a). A retaliation claim is "not dependent on the merits of the underlying discrimination complaint." Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986). Thus, to establish a prima facie case of retaliation, an employee need only show that: (i) the employee engaged in a protected activity; (ii) the employer knew of this activity; (iii) the employer took adverse action against the employee; and (iv) there was a causal relation between the adverse action and the employee's protected activity. Cifra v. Gen. Elec. Co., 252 F3d 205, 216 (2d Cir. 2001); Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 1996). The filing of a complaint with an anti-discrimination agency constitutes protected activity. 42 U.S.C. § 2000e-3(a); see Terry v. Ashcroft, 336 F.3d 128, 140-42 (2d Cir. 2003).

Here, it is clear that the alleged negative reference furnished by HSBC to the Bank of America cannot be causally related to the filing of Amoako's EEOC charge because this alleged act of retaliation occurred before the charge was filed. Thus, the only conceivable basis for a retaliation claim is Amoako's assertion that, after "receiving notice of his termination, [he] immediately responded by letter to the firm refuting all claims . . . with particular emphasi[s] on the fact that he still did not know who had made the initial complaint." (Compl. ¶ 12). Amoako, however, has not furnished the Court with a copy of this letter, nor is there any reason to believe that it accused HSBC of having acted with a discriminatory motive.

17

In any event, even if the Court were to assume that Amoako's letter alleged that his termination was based on his race, color, or national origin, and thus constituted protected activity, to prevail on his retaliation claim, Amoako still would have to establish that HSBC engaged in activity adverse to him after learning of his discrimination complaint. The only support for this claim that Amoako proffers is his assertion that an individual acting on behalf of the Bank of America allegedly told him that an HSBC representative had provided the Bank of America with a negative evaluation of his performance at HSBC.

The alleged retaliatory statement by the HSBC representative is not offered for the truth; indeed, it is offered for its falsity. Accordingly, that statement is not hearsay. See Fed. R. Evid. 801(c)(1), (2) (defining hearsay as an out-of-court statement "offer[ed] . . . to prove the truth of the matter asserted in the statement"). What the Bank of America representative allegedly told Amoako, however, is unquestionably hearsay. Id. Moreover, there does not appear to be any exception to the hearsay rule pursuant to which this Court could consider Amoako's recapitulation of what he allegedly was told. See Fed. R. Evid. 803, 804; see also Fed. R. Evid. 801(d) (statements that are not hearsay).

Accordingly, because there is no admissible evidence suggesting that HSBC retaliated against Amoako by furnishing the Bank of America with a negative reference, Amoako cannot prevail on his retaliation claim even if he engaged in protected activity soon after his termination.

IV.     Conclusion

For the foregoing reasons, HSBC's motion for summary judgment (ECF No. 85) should be granted.

V.      Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen (14) days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and to my chambers at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

SO ORDERED.

Dated:  New York, New York
        December 30, 2014

                                                _____
                                                FRANK MAAS
                                                United States Magistrate Judge

Copies via ECF to:

Honorable Paul A. Crotty
United States District Judge

Kingsley Oteng-Amoako

All counsel